Good morning ladies and gentlemen. We have four cases on the calendar this morning, a patent case, a trade case, two veterans cases, one of which is being submitted on the briefs and will not be argued. The first patent case is Plera, Applied Biosystems v. Illumina and 1253. Mr. Reines. Thank you your honor. May it please the court. I'd like to address at the outset undisputed facts that establish as a matter of law that Steven Misiewicz cannot carry his burden of establishing the right to the 663 application and related patents. First, it's patent portfolio including managing and expanding its genetic analysis patent portfolio. That specifically was his responsibility. Mr. Reines, isn't his employee agreement against true? He agreed to assign all inventions except the following, A, B and C. A, B and C, but one of the doesn't result from any work performed by me for the company. So where is there a lack of substantial evidence that he met A, B and C too? I think the answer to that your honor is that to understand that provision you have to understand that it's incorporated the statutory provision that section 7 of that same agreement incorporates the contract, excuse me, the statutory section. Does the contract indicate that it's incorporating the statutory section? It doesn't per se say that it's incorporating the statutory subsection, but what it does do is it says that the A, B only has the obligation to keep confidential inventions reported by Misiewicz that fall within the exclusion of the statutory subsection. This is an assignment issue not confidentiality. Right, but it would be nonsensical to have a contract interpreted so that the company would have been free to publicly disclose any of the inventions he reported that fell within the gap between the contract language and the statutory language. But I'm confused. Are you saying to prevail we have to accept parole evidence that the intent of the parties was not to be bound by the literal language of the contract, but rather that this literal language was to reflect the California statutory language? No, not parole evidence. That's what I'm trying to understand. Yeah, section 7 of the statute. That's A22604. Okay, but the statute is parole evidence, Mr. Reines. How is the statute relevant to this provision? I mean, California law is clear that you interpret the contracts that reference the statutory provision by reference to the statutory provision. There's a reference to it here. And basically the contract would make no sense if treated as having a gap. In this section, there's a reference that this part of the contract was meant to be governed by the statute. No, that's not in 2. Okay, so if there's no reference to the statute in 2, then your earlier argument, which suggested to me that when the contract references the statute, you have to use the statute, isn't really relevant to our interpretation of this section, is it? I just think it's nonsensical to construe the contract that way. But if you don't agree with that- Perhaps you shouldn't have written it that way. Understood. So I think we still prevail even if the contract's construed in a way which I think is nonsensical for multiple reasons. How do you rationalize the first sentence of paragraph 7 of the contract, which qualifies fully under the provision of section 2870? Is that an incorporation by 2870? I think it shows the clear intent of the parties that this is mapping to 2670. I don't think it's a per se statement that it's incorporated, but I think to not construe this in view of the statute is inconsistent with California law and inconsistent with common sense. But which version would apply then? The original version when the contract was entered into, the amended version, or otherwise? If it's not incorporated by reference, what does that mean as far as the amendment to the statute? And if I could address why we win under either interpretation of the agreement. Either interpretation of the agreement, then you're saying that the statute was never amended? I'm not aware in any material part. What about that semi-colon of change? I'm not aware of any argument being made by opposing counsel on that. So I'm not aware of any significant issue with that. And it incorporates 2870, at least by referring to it. And that's how California courts construe these contracts. But it's not incorporated by reference. It makes a reference to 2870. It doesn't say we hereby incorporate by reference 2870. You're right. So Mr. Reines, you wanted to explain why even if we're looking at C2, you still prevail. So why don't I give you a chance to go ahead and address that. Under C2, how is there not substantial evidence to support a jury determination that this does not result from any work performed by him for the company? On the resulting from his work, for one thing, he describes among the actions that he took as patent counsel was to analyze the sequencing by hybridization patent portfolio of the company. He puts that on one of his works that he's accomplished as part of his work. And he also states repeatedly that this patent stems from sequencing by hybridization. That's a very direct result of the work that he did. It was within his duty to file patent applications in the genetic analysis field. The only argument the other side makes as to why the resulting from Prong is not met is that he was not hired to invent. Well, all he did, I mean, this was a paper patent. There's no argument that there was any wet chemistry going on. He filed the patent application. He was working in this technology area. He was analyzing the strategy for sequencing by hybridization patenting. It's directly related. This is pretty serious stuff. And then on the relating to the business, in 19... Can we back up before you change to relating to the business? What about the evidence that was presented that is pointed to in the briefs that suggests that this invention didn't derive from work he did for the company, but rather derived from work he did in the filing of independent patent applications on his own dime, which he was allowed to moonlight and do? What about that evidence? Couldn't the jury have credited the evidence that this didn't stem from anything he learned through his job, but rather stemmed from the work he was doing on the side? I mean, it depends what you mean by stemmed from. Obviously, he stated that his interest in DNA sequencing altogether was a result of his job position. He testified that there's evidence from him that sequencing by hybridization patent portfolio analysis was something he did. So, in terms of resulting from, I think that was within the scope of his duties, and that's why he was in a position to file his patent application. On the subject of relating to, if you look at the patent, I think this is very important, the patent itself does two things. One is it says this is a very broad, it's not just genomic sequencing, it relates to forensics, it relates to medical diagnostics, it relates to genetic counseling, it's broadly in the genetic analysis field. And the second thing that the patent says is it goes to great lengths and culminates by saying the problem is Sanger, and then it says how it improves over Sanger and that it's a substitute and replacement for Sanger sequencing. How could it not be related to the company's business if it's supposed to replace? The problem is related to the company's business as C1 followed by an or. So, if C2 applies, C1 is out of the picture. Well, I mean, under that construction of this contract. I mean, I think that you can read the text of C to be disjunctive by saying, showing what the clear intent is, I think, from the context of the overall document, that it does not relate to the business or actual, that's one, or it does not result from any work performed from it. I think everyone understood it. There's not, you know, the amount of time devoted by the opposing counsel on this was minimal in their briefing, and it's just nonsensical to construe the statute that way. But in any event... But that's not the statute. You're reading from the contract. That's correct. Right? So, is that tracking the statute? I think it's obviously an attempt to track the statute, and I think I've said what I can say on that. In terms of B, which I think unquestionably, if he didn't carry his burden of establishing B, we all agree that there's no ownership demonstrated, and that's use of a trade secret. And this, I think, simple and maybe avoids the whole contractual conundrum here that's been addressed. What about the obviousness of the 119 claim? Your Honor, can I just briefly address the use of the trade secret, and then get to that? It's your time. Thank you. On the use of the trade secret, he never denies using the trade secret. It's on his conception page, and then his only response is, well, there's two different ways to do it. In other words, there's two different embodiments that he had in his initial conception. Well, it doesn't matter. He came up with the conception using a trade secret of ABI as part of the conception. It's on the page of conception. It's just simple. There's no response. You won't hear any good response to that. He denies that it was his invention. That's not the point. We're not saying it's his invention. It was in his conception of how it was done. He just says that's one of two ways. On obviousness, there's two issues of obviousness. One is, would you label the oligo? And the other is, would you use it as a probe? The real argument, I think, originally was, would you use it as a probe? And we demonstrated that MAG says to use it as a probe. So that's just right out of the reference. In terms of labeling it, that's sort of, to me, a trivial debate. Everyone knows, once you make a probe, that labeling is the most common, basic way you do it. Didn't your side somewhere say it was a jury issue? I think they said they trusted the jury. I don't think that- No, actually, during closing argument, I believe that you said that this was a battle of the experts, and it's all about who you believe. I think trial counsel may have said something like that. To me, that's not a waiver of the obligation on obviousness for the court to review it. And given how simple the issue is, which is it says to use it as a probe, and it's right in the patent that labeling is a trivial way to make a probe, it seems straightforward. They're saying it's almost anticipated. It's really very close to being anticipated. The original debate was whether you could use it as a probe. Their argument was, without his DNA sequencing technique, you wouldn't know you wanted to use it as a probe. They're saying it's 102.5. All right, we'll save your rebuttal time. Thank you. Thank you, Your Honor. May it please the court. As you've recognized, this is a contract issue. It's a breach of contract case. AB agreed to limit the entire case on ownership to whether Masevich satisfied the three exceptions under the contract. That's the only issue here. As far as 2870, the statute in California goes, the contract didn't incorporate 2870. Did you argue before the jury that you only had to prove Part 2C in order to establish the fact that it's not covered by the related to? We did argue to the jury that you only had to satisfy one of 2CI or 2C2I, as we call it. We did argue that below, yes. So you only had to prove one or the other? Yes. That's the case. Can you point to the record where that's shown? That confirms that. Is that part of the record below? I couldn't quite find it in the record that you had distinguished that specific argument. I don't believe, Your Honor, I have to say standing here, I don't believe that we included the page of the transcript from the final argument that does that in the appendix. I'll have to check. That's a very critical point, though, isn't it? Well, I think the critical point actually here goes back to this 2870 issue in that AB didn't ask for any kind of instruction at all and didn't object when there was no instruction of the jury on how this contract and these three exceptions and related to or resulted from or any of those are interpreted. So they waived any objection to the interpretation of the contract and they failed to ask for any construction or any instruction to the jury as to what related to should mean or whether it should be or in 2C. Well, to me, that's the dispositive issue. If the contract is ambiguous, then you really have to bring in some plural evidence to establish and remove the ambiguity. And as far as I could tell, the particular contract tracks the language of 2870 but doesn't really incorporate it by reference. It does not incorporate it by reference. It doesn't incorporate it through expression. And there was no request for an instruction on that. If you want to talk about it being ambiguous, it's going to be construed against AB who drafted it. But counsel, we know how at least the California Appellate Fourth Division in the Cadence case would construe identical language because the identical language down to the comma appears in the statute. And we know that the California Appellate Court in that case said, well, I know it says or, but they really mean and. That's a shorthand version of what they said. But that's nonetheless what they said. But they went on to explain why that it wouldn't make sense to draft this in a way to say or because clearly companies would mean to prevent employees from doing both of those things, not one or the other. And so we are, of course, bound to apply California contract law principles to this. Are we bound by that particular interpretation? All of the California case law deals with whether under 2870 the contracts are enforceable. And that's the case law in California that they've dealt with. 2870 in employee invention agreements deals with the issue of whether those contracts are enforceable, not as to this kind of situation as to whether you should be able to apply one or the other. In any event, we win under either interpretation because we satisfy 2A, 2B, 2C1, and 2C2. So if I might just spend a little bit of time on that. Even if we consider 2C2 as a separate section, as a separate requirement. That's correct, Your Honor. Because this was a jury case. And in order to overturn that jury verdict and Judge Alsop's denial of the Jamal motion, they have to show that we didn't have substantial evidence. And you can go right down the line. 2A, not disputed. He did it all on his own time. 2B, they only raised the trade secret issue. But we put in testimony from Macevic. We relied on testimony from Dr. Fung. We relied on testimony from the former vice president at AB and a research scientist who directed their research and development on sequencing, Dr. Oaks. And testimony from Dr. Fung himself. All of which showed that, and which the jury relied on to find, and apparently did find, that Macevic didn't use any information from AB. That he did it all on his own. But if you have to prove the CI relates to, it's kind of tough for me off the top of my head to say that your, Mr. Macevic's sequencing technology doesn't relate to DNA sequencing technology. And that that isn't the business that AB is in. We presented substantial evidence to the jury, which the jury was entitled to rely upon, and apparently did, that in fact, Macevic's revolutionary, which it was, revolutionary new sequencing technology, which was completely different from Sanger sequencing, was not related to AB's DNA sequencing business. Which, again, Dr. Oaks, trial exhibit 149, which is 23552 in the appendix, Dr. Elder and Dr. Macevic all offered testimony which showed that, in fact, their DNA sequencing business was entirely focused on Sanger sequencing. But the agreement goes beyond business. It goes beyond, it goes to demonstrably anticipated research or development. And there was no evidence, Your Honor, put in that they had a demonstrably, or anticipated, actual or anticipated research and development on this kind of sequencing. There was no evidence put in on that. If the invention was not related to, why was it offered to the company? There's a difference. There's a difference between, and this came up at trial, actually, there's a difference between whether Mr. Hunkerpiller, who was running AB at the time, or AB itself, or somebody at AB, was interested in technologies and whether that technology was part of its business. And there is, there's nothing you can point to and nothing AB pointed to that showed that AB was interested or, but more importantly, actually incorporated as part of its business anything other than Sanger sequencing. And there was a good reason for that. It was the only game in town. They were very successful. Why wasn't the 119 patent very obvious? Because... Putting a label on an oligo, especially in light of the MAG reference. Because all the MAG reference says is that an oligo nucleotide containing a phosphoramidate linkage could be used in a DNA probe-based affinity assay. And they, AB, didn't put in evidence that showed that one of ordinary skill would have understood that. Even without the MAG reference. Because as Dr... Sorry to interrupt. No. As Dr. Batman testified... Are oligos usually labeled? No. An oligo can be used by itself. Used as a probe? Could be used as a probe without a label, could be used as a probe with a label. And in fact, the evidence showed, and their own experts' testimony showed, that you can refer to an unlabeled piece of DNA as a probe. You can refer to a labeled piece of DNA as a probe. But the critical issue is they never showed that one of ordinary skill would have looked at what they pointed to, which was MAG, and particularly the last sentence in MAG, and would have understood that to mean that you use a phosphoramidate cleavable linkage oligo as a labeled probe, even in a DNA, the language, the probe-based affinity assay. There simply was no evidence on that. They had to put in evidence to carry their clear and convincing burden, that one of ordinary skill would have understood that to mean that you use that cleavable probe with a label in that assay. Did you actually introduce evidence that not all probes are labeled and vice versa? Or were you simply relying on the absence of evidence to establish that all probes are, in fact, labeled? We were actually relying on their own experts' testimony, as we cited in our brief, that, in fact, when you look at what their witness testified to, that a probe could be labeled or could not be labeled, and that not all probes are labeled. And then further, we relied... Not all probes are labeled? Well, when you look at what he said, he refers to unlabeled DNA as probes, and he refers to labeled DNA as probes. And Dr. Bachman said, on the motivation issue, if I might just go to that, we put in affirmative evidence from Dr. Bachman that, in fact, until you had Dr. Macevich's inventions, the sequencing inventions, you had no reason... One of ordinary skill had no reason to put a label on a cleavable phosphoramidate-containing little piece of DNA. There was just nothing in the art that would have motivated you to do that, and they didn't put any evidence to show that you would. I want to get to one of your cross-appealed issues. Thank you, Your Honor. And construction of 597? So, Judge Alsop below construed Step A in the 597 Claim 1, this is at A57 of the appendix, as encompassing, ligating a probe to an extended duplex. And the language of the claim is quite clear, that when you conduct 597 Claim 1, that method, that once you've gone through a cycle, you don't have an initializing alkyl gluotide anymore. So that when you repeat, you can't go back and extend an initializing oligonucleotide if it's an extended duplex already. And all that means is, from the plain language of the claim is, you have to use more than one initializing oligonucleotide. You have to use different initializing oligonucleotides when you repeat these steps. It's as simple as that. Now, this would cover a process in which you went on and actually added multiple probes, ligating them again and again and again, to something that was originated with a single initializing oligonucleotide. But you're not covered, you don't satisfy this method, unless you actually come back at some point, and use a second initializing oligonucleotide probe, and attach or ligate a probe to that. It's the simple language of the claim. We've got specification support that distinguishes initializing oligonucleotides from extended duplex. 597 Column 3, 1 through 9, Summary of the Invention says it very, very clearly. Once you go through the first cycle, you don't have an initializing oligonucleotide anymore. You have an extended duplex. We had Backman, who testified about that in rebuttal to Metzger's testimony for AB. And in the prosecution history, in particular, we distinguished that nicophorol reference, an anticipatory reference raised by the examiner, because it didn't repeatedly ligate probes to an initializing oligonucleotide. Judge Alsop also construed Step C in 597 Claim 1 as being conditional. Frankly, this came out of nowhere. The plain words of the claim require, I mean, you just have to read the claim. C says repeating Steps A and B. Until. And I can guarantee that if they had a one-step process. But if the sequence is determined, why do you keep on repeating? In order to satisfy the claim, you have to repeat. And in fact, I think the critical issue here is, because I'm short on time. In other words, the claim is interpreted to an absurdity, to an impracticality? You don't satisfy the claim unless you repeat. If they had one of these hypothetical one-step sequencing methods, I can guarantee you they'd be saying they don't infringe this claim. And in fact, I think the critical point is, is that we distinguished over nicophorol. Why do you have to repeat? I'm not understanding. You want us to focus very hard on the exact language of the claims for the initializing oglionucleotide language, in contrast to what the specification seems to suggest differently. But yet, you don't want us to focus on the exact language of Claim C. Repeat until sequence is determined. So which is it? Because in the prosecution history, we distinguished this method over nicophorol, the nicophorol reference, expressly because in nicophorol, there was no need for repetition. That's the exact language from the prosecution history. A4513 in the appendix. We distinguished over a reference that didn't repeat because we said, you have to repeat. In nicophorol, there was no need for repetition. Therefore, it can't satisfy this claim. So the plain language is repeating. And we distinguished over a reference. So the patentability of this claim was dependent on that, that you have to repeat. But in order to infringe it, you would also have to repeat to perform Step C. That's exactly correct. Exactly correct, Your Honor. I see I've got a little bit of time left that I wanted to hold on to, so I'll stop there. We will hold on for you. Thank you. Mr. Reines. Thank you, Your Honor. First, when I was up here originally, I pointed out that you would not hear any argument that in terms of using the trade secret, which is absolutely banned. It was their burden to show there was no use of the trade secret coming up with the convention. That's what the contract says, that you wouldn't hear any denial of that. The place to look is A20806. Please look at the testimony. The response from Misevich, who was highly motivated to be an adversary in this process, was, yes, it's there, but it's one of two ways to perform it. And that's the one that he showed in the conception. Then when he went to write the patent up, he didn't put the trade secret in the patent, but he used it to come up with the conception. It's just a two-stepper. And there's no denial. They spent 10, 12 minutes, and they didn't even address that. In terms of the relating to, two things. One is it's factually incorrect that the company was only working on Sanger sequencing. In fact, Misevich himself was analyzing sequencing by hybridization, which is what he says inspired and was related to the patent that he submitted. He was analyzing their portfolio on that subject and that space. They just didn't pursue Brennan because it wasn't commercially as valuable at the time as Sanger, right? Brennan's something different, but they didn't do a business deal. This is their own employee, their own trusted patent counsel had a patent. Would they have accepted it to fill out and expand their portfolio as was his obligation? Of course they would have. Did they want to do a joint venture with a Nobel laureate on an expensive technology? No. That doesn't suggest to me that they wouldn't have been interested in it. They're obviously interested in it. I really think there's no doubt it's related. How can you put a patent, you're a patent counsel, you put in a patent application that Sanger has all these problems. It requires expensive electrophoresis equipment. It gives you bad data that you can't do a lot of analysis with. I've got the solution for that. Your Honor, it's a very persuasive argument except when you look at the contract. Well, on the contract, let me address that squarely. So the Cadence case that was referenced earlier, what the court there said in California, the scope of the invention agreement, it said the language of the agreement closely tracks the language of 2870. It's far more different from 2870 than the contract here. And the agreement expressly references the statute, doesn't incorporate by reference, references it. The scope of the invention agreement is therefore coextensive with the scope of 2870. That's the way people understand it. It's nonsensical. Just listen to my argument on the confidentiality. Who would ever write a contract that creates a gap between what the company had to keep confidential and what they could keep? Under that interpretation of the contract, they'd be able to keep. But wouldn't it have been simpler to say, we hereby incorporate by reference section 2870? It may have been simpler. It may have been simpler, but everyone was operating on the assumption that the third portion was a conjunctive requirement. You can even read that language with their, I understand the argument that it's ambiguous. They didn't make a big deal of this. Look, it's buried in their brief. There's about a paragraph on it. The reason is because it doesn't make sense you'd ever come up with a contract that says, even if it's related directly to the middle of our business, it might be something that you can go patent. Or even if it comes resulting from the work that you do, that's the contractual interpretation we're talking about. Even if it results from the very work you do for us, you can keep the invention if it doesn't relate to our business. We see how fine their parsing relates to the business. It makes no sense. It makes no sense with the confidentiality. It makes no sense internally. But in any event, we don't need any of it. They use the trade secret. On the conception page, two-thirds of the conception page is a trade secret of ABs that's undisputed. And the defense isn't we didn't use that. That's not what I claimed. And I didn't end up using it in the application because there's an alternative embodiment. So what? And you heard not a word. On the obviousness issue. Your time is up. If you want to make a very brief statement, go ahead. Sure, Your Honor. Thank you for your kind. On obviousness, the idea that there was a probe, there was one-way expert evidence. It's documented in the briefs. I won't rehash it. That the mag says probe-based assay. That means use it as a probe. There was no expert evidence on the other side. And then once you know you're going to use it as a probe, labeling it is trivial. Their own patent application says that. Thank you very much. I appreciate it. Mr. Flowers, you are only entitled to a second argument on the cross-appeal. And there was nothing to rebut on the cross-appeal. So I think the argument is over. Thank you. Thank you very much. The case will be submitted.